IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| **AXIS HEALTH AT CALVERT OPCO LLC**<br>22 Pleasant Ridge Road<br>Spring Valley, New York 10977<br><br>AND<br><br>**AXIS HEALTH AT MANOKIN OPCO LLC**<br>22 Pleasant Ridge Road<br>Spring Valley, New York 10977<br><br>AND<br><br>**AXIS HEALTH AT CAROLINE OPCO LLC**<br>22 Pleasant Ridge Road<br>Spring Valley, New York 10977<br><br>AND<br><br>**AXIS HEALTH AT LONG VIEW OPCO LLC**<br>22 Pleasant Ridge Road<br>Spring Valley, New York 10977<br><br>AND<br><br>**AXIS HEALTH AT BIRCH OPCO LLC**<br>22 Pleasant Ridge Road<br>Spring Valley, New York 10977<br><br>AND<br><br>**AXIS HEALTH AT OAK MANOR OPCO LLC**<br>22 Pleasant Ridge Road<br>Spring Valley, New York 10977<br><br>AND | **Civil Action No.: CCB-20-463** |

**AXIS HEALTH AT DERRY OPCO LLC**
22 Pleasant Ridge Road
Spring Valley, New York 10977

   *Plaintiffs*,

v.

**CALVERT MANOR HEALTHCARE CENTER, LLC**
8227 Cloverleaf Drive, Suite 309
Millersville, Maryland 21108

**SERVE ON:** Stanley H. Snow
      9900 Meriden Road
      Potomac, Maryland 20854

**AND**

**AURORA SENIOR LIVING OF MANOKIN, LLC**
8227 Cloverleaf Drive, Suite 309
Millersville, Maryland 21108

**SERVE ON:** Stanley H. Snow
      9900 Meriden Road
      Potomac, Maryland 20854

**AND**

**CAROLINE NURSING AND REHABILITATION CENTER, LLC**
8227 Cloverleaf Drive, Suite 309
Millersville, Maryland 21108

**SERVE ON:** Stanley H. Snow
      9900 Meriden Road
      Potomac, Maryland 20854

**AND**

**LONG VIEW HEALTHCARE CENTER, LLC**
8227 Cloverleaf Drive, Suite 309
Millersville, Maryland 21108

| | |
|---|---|
| **SERVE ON:** | Stanley H. Snow<br>9900 Meriden Road<br>Potomac, Maryland 20854 |

**AND**

**AURORA SENIOR LIVING OF DERRY, LLC**
8227 Cloverleaf Drive, Suite 309
Millersville, Maryland 21108

| | |
|---|---|
| **SERVE ON:** | CT Corporation<br>2 1/2 Beacon Street<br>Concord, New Hampshire 03301 |

**BIRCH MANOR HEALTHCARE CENTER, LLC**
8227 Cloverleaf Drive, Suite 309
Millersville, Maryland 21108

| | |
|---|---|
| **SERVE ON:** | Stanley H. Snow<br>9900 Meriden Road<br>Potomac, Maryland 20854 |

**AND**

**OAK MANOR HEALTHCARE CENTER, LLC**
8227 Cloverleaf Drive, Suite 309
Millersville, Maryland 21108

| | |
|---|---|
| **SERVE ON:** | Stanley H. Snow<br>9900 Meriden Road<br>Potomac, Maryland 20854 |

*Defendants*.

## AMENDED COMPLAINT

Plaintiffs, Axis Health at Calvert Opco LLC ("**Axis Calvert**"), Axis Health at Manokin Opco LLC ("**Axis Manokin**"), Axis Health at Caroline Opco LLC ("**Axis Caroline**"), Axis Health at Long View Opco LLC ("**Axis Long View**"), Axis Health at Birch Opco LLC ("**Axis Birch**"),

3

Axis Health at Oak Manor Opco LLC ("**Axis Oak**"), and Axis Health at Derry Opco LLC ("**Axis Derry**") ("**Plaintiffs**"), by and through their undersigned counsel, Nathan D. Adler, Steven J. Willner, and NEUBERGER, QUINN, GIELEN, RUBIN & GIBBER, P.A., file this Amended Complaint against Defendants, Calvert Manor Healthcare Center, LLC ("**Aurora Calvert**"), Aurora Senior Living of Manokin, LLC ("**Aurora Manokin**"), Caroline Nursing and Rehabilitation Center, LLC ("**Aurora Caroline**"), Long View Healthcare Center, LLC ("**Aurora Long View**"), Aurora Senior Living of Derry, LLC ("**Aurora Derry**"), Birch Manor Healthcare Center, LLC ("**Aurora Birch**"), and Oak Manor Healthcare Center, LLC ("**Aurora Oak**") ("**Defendants**"), and allege as follows:

## INTRODUCTION

1. This lawsuit arises out of Defendants' defiant refusal to honor the contractual terms and commitments set forth in their nursing home transfer agreement with Plaintiffs.

2. On November 1, 2019, Plaintiffs acquired the operations and assets of seven skilled nursing facilities (the "**Facilities**") from Defendants, pursuant to the terms of an Operations Transfer Agreement ("**OTA**") executed by Defendants and Plaintiffs' assignor and predecessor-in-interest, Axis Healthcare, LLC ("**Axis Healthcare**").  A true and correct copy of the OTA is attached as Exhibit 1.

3. Of the assets acquired by Plaintiffs under the OTA were contracts which Aurora Calvert and Aurora Manokin each had with the United States Department of Veterans Affairs (the "**VA**"), under which Aurora Calvert's and Aurora Manokin's Facilities had the right to accept veterans as patients and receive reimbursements from the VA for healthcare services rendered to veteran patients.

4. Pursuant to federal regulations, to effectuate the transfer of these VA contracts from Aurora Calvert and Aurora Manokin to Axis Calvert and Axis Manokin – the "New Operators" of Aurora Calvert's and Aurora Manokin's Facilities – Axis Calvert and Axis Manokin were required to submit "novation agreements" to the VA signed by Aurora Calvert and Aurora Manokin.

5. Plaintiffs sent novation agreements to Aurora Calvert and Aurora Manokin, true and correct copies of which are attached as Exhibit 2 (the "**Novation Agreements**"), and requested that they sign the Novation Agreements. However, Aurora Calvert and Aurora Manokin defiantly refused to sign the Novation Agreements, in flagrant breach of the OTA, causing Plaintiffs to incur significant revenue losses and other costs and expenses.

6. Additionally, under the OTA, Plaintiffs had the option (but not a duty) to assume third-party contracts that Defendants had executed with various vendors and suppliers relating to the Facilities' operations, such as contracts for the provision of maintenance, equipment, telecommunications, utilities, software, hospice, and transportation services (the "**Operating Contracts**").

7. Though Plaintiffs never exercised their option to assume any of the Operating Contracts, Defendants erroneously, mistakenly, and/or fraudulently attached full lists of all of Defendants' Operating Contracts to assignment agreements executed by the parties at closing, and then demanded that Plaintiffs assume all the Operating Contracts and their liabilities even though Plaintiffs never manifested any assent to assume *any* of the Operating Contracts.

8. As a result of Defendants' improper contention that Plaintiffs are contractually obligated to assume all Operating Contracts, and Defendants' refusal to terminate the Operating Contracts and pay all costs, expenses, and other liabilities arising from the Operating Contracts,

Plaintiffs have been forced to pay for liabilities unpaid by Defendants arising from the Operating Contracts which Plaintiffs have no obligation to assume.

9. Accordingly, Plaintiffs bring this action seeking to recover damages incurred as a result of Defendants' contractual breaches, and further seeking other equitable and declaratory relief.

## PARTIES

10. Plaintiffs, Axis Calvert, Axis Manokin, Axis Caroline, Axis Long View, Axis Birch, Axis Oak, and Axis Derry are Delaware limited liability companies with their principal places of business in New York. Plaintiffs are referred to in the OTA as the "**New Operators**."

11. Defendants, Aurora Calvert, Aurora Manokin, Aurora Caroline, Aurora Long View, Aurora Birch, and Aurora Oak are Maryland limited liability companies, and Aurora Derry is a New Hampshire limited liability company, with principal places of business in Maryland. Defendants are referred to in the OTA as the "**Transferors**."

12. Collectively, Plaintiffs and Defendants are referred to herein as the "**Parties**."

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendants and the amount in controversy exceeds $75,000, exclusive of costs. Specifically:

(a) Each Plaintiff is wholly owned by Axis Health Opco Holdco, LLC, a Delaware limited liability company whose members, Abraham Kraus and Avi Philipson, are New York residents. Therefore, Plaintiffs are citizens of New York for purposes of § 1332.

(b)     Upon information and belief, each Defendant is either directly or indirectly owned by Maryland residents Stanley H. Snow and Robert G. Owens.  Therefore, Defendants are citizens of Maryland for purposes of § 1332.

(c)     As a result of the acts of Defendants alleged in this Amended Complaint, Plaintiffs have already incurred damages exceeding $75,000, and continue to incur additional damages.

14.     This Court has both general and specific personal jurisdiction over Defendants, as well as jurisdiction over Defendants pursuant to Md. Code Ann., Cts. & Jud. Proc. § 6-103, as all Defendants are domiciled in Maryland and the causes of action asserted herein all arise out of Defendants' business transactions and regular business conduct in Maryland.

15.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2), as all Defendants reside in this District and a substantial part of the events or omissions giving rise to the causes of action asserted herein occurred in this District.

## FACTUAL ALLEGATIONS

**A.     Execution and Closing of the OTA**

16.     On July 1, 2019, Defendants executed the OTA, agreeing to sell, assign, and transfer all rights, title, and interest in and to the operations and assets of the Facilities to Plaintiffs' assignor and predecessor-in-interest, Axis Healthcare, at a future closing that would consummate all transactions contemplated by the OTA (the "**Closing**").

17.     On October 31, 2019, in accordance with § 11.3 of the OTA, Axis Healthcare executed an Assignment Agreement in which it assigned to each Plaintiff the right under the OTA to acquire all rights, title, and interest in and to the operations and assets of one of the seven Facilities.

18. The Closing was held on November 1, 2019, at which time each of the seven Defendants conveyed, transferred, assigned, and delivered each of their rights, title, and interest in and to the Facilities' operations and assets to each of the seven Plaintiffs, as illustrated in the chart below:

| Transferor/ Defendant | New Operator/ Plaintiff | Facility |
|---|---|---|
| Aurora Calvert | Axis Calvert | Calvert Manor Healthcare Center | renamed Calvert Manor Center for Rehabilitation and Healthcare (the "**Calvert Facility**") |
| Aurora Manokin | Axis Manokin | Aurora Senior Living of Manokin | renamed Manokin Center for Rehabilitation and Healthcare (the "**Manokin Facility**") |
| Aurora Caroline | Axis Caroline | Caroline Nursing and Rehabilitation Center| renamed Caroline Center for Rehabilitation and Healthcare (the "**Caroline Facility**") |
| Aurora Long View | Axis Long View | Long View Healthcare Center | renamed Long View Center for Rehabilitation and Healthcare (the "**Long View Facility**") |
| Aurora Birch | Axis Birch | Birch Manor Healthcare Center | renamed Birch Manor Center for Rehabilitation and Healthcare (the "**Birch Facility**") |
| Aurora Oak | Axis Oak | Oak Manor Healthcare Center | renamed Oak Manor Center for Rehabilitation and Healthcare (the "**Oak Facility**") |
| Aurora Derry | Axis Derry | Aurora Senior Living of Derry | renamed Derry Center for Rehabilitation and Healthcare (the "**Derry Facility**") |

**B.  Defendants refused to execute the Novation Agreements necessary to effectuate the transfer of the VA Contracts.**

19. Pursuant to § 1.1(a)(iii) of the OTA, included in the assets that were sold, assigned, and transferred from Defendants to Plaintiffs (the "**Transferred Assets**") were:

> all transferable licenses, transferable permits and other transferable governmental approvals or authorizations which are used, or may be used, in connection with the Facilities (including, without limitation, any authorizations to participate in any federal reimbursement program such as Medicare in accordance with Section 1.2 below), whether issued or granted by any Governmental Authority or by any other Person, and all operating, license and certification rights with respect to the Business (except as otherwise provided in Section 1.2 below) […].

20. Schedule 1.2 of the OTA – incorporated into the OTA under § 1.2(d) – listed all "Third Party Payor" contracts that Plaintiffs had with third-party organizations, including government organizations, that maintain a healthcare reimbursement policy or program.

21. Listed in Schedule 1.2 are contracts that Aurora Calvert and Aurora Manokin each had with the VA. Upon information and belief, these VA contracts were Basic Ordering Agreements procured by Aurora Calvert and Aurora Manokin pursuant to the Federal Acquisition Regulation, 48 C.F.R. § 1 *et seq.*, that authorized Aurora Calvert and Aurora Manokin to participate in the VA's Community Nursing Home program (the "**VA Contracts**"). The VA Contracts empowered Aurora Calvert and Aurora Manokin to accept veterans placed by the VA in the Calvert and Manokin Facilities and to receive reimbursements for healthcare services provided to the placed VA patients.

22. The VA Contracts are transferrable under the Federal Acquisition Regulation in the event of an asset transfer – such as the one that occurred under the OTA – upon the submission of a "novation agreement" signed by both the transferor and transferee of the contract. The novation agreement must be in the format set forth in § 42.1204(i) of the Federal Acquisition Regulation.

23. Thus, the VA Contracts are "transferable governmental approvals or authorizations which are used, or may be used, in connection with the Facilities" within the scope of § 1.1(a)(iii) of the OTA, and were included in the Transferred Assets.

24. Indeed, § 1.9(c) of the OTA obligated Plaintiffs to "assume and perform any and all obligations" under "all patient agreements, occupancy agreements, residency agreements and similar agreements relating to the occupancy of the Facilities by the patients and residents thereof (the "**Patient Agreements**")." Upon information and belief, Defendants Aurora Calvert and Aurora Manokin entered into separate and individual agreements with the VA for each patient

placed in their Facilities in which the VA authorized them to provide healthcare services to each placed patient. Because those separate and individual VA agreements constituted "Patient Agreements," which Plaintiffs assumed and were obligated to perform under § 1.9(c) of the OTA, it was necessary for Aurora Calvert and Aurora Manokin to effectuate the transfer of the VA Contracts so that Plaintiffs could provide healthcare to the VA-placed patients in the Calvert and Manokin Facilities.

25. Under the OTA, Aurora Calvert and Aurora Manokin are obligated to sign documents necessary to give effect to the transactions set forth in the OTA. Specifically, § 10.1 of the OTA provides, in relevant part:

> Further Assurances. From and after the Closing Date, Transferors, on the one hand, and New Operators, on the other hand, agree to execute and deliver such further documents and instruments and to do such other acts and things (including the making of filings), as New Operators or Transferors, as the case may be, may reasonably request in order to effectuate the transactions contemplated by this Agreement.

26. Further, under Recital F of the OTA (which was incorporated into the OTA as a term of the agreement), the Parties expressly represented that it was their intention to enter into the OTA "to provide for an orderly transition of the operations of the Facilities."

27. Accordingly, Aurora Calvert and Aurora Manokin owed Plaintiffs a contractual duty to sign novation agreements necessary to effectuate the sale, assignment, and transfer of the VA Contracts from Aurora Calvert and Aurora Manokin to Axis Calvert and Axis Manokin.

28. Yet, despite Plaintiffs' repeated requests, Aurora Calvert and Aurora Manokin refused to sign the Novation Agreements, in material breach of § 10.1 of the OTA.

29. Defendants Aurora Calvert and Aurora Manokin refused to sign the Novation Agreements with full knowledge that Plaintiffs were unable to receive reimbursements for healthcare provided to their existing VA patients, or accept new VA patients at their Facilities,

without signed Novation Agreements accepted by the VA.  Further, because Plaintiffs assumed and were obligated to perform healthcare services to VA patients at their Facilities pursuant to the Patient Agreements, it was necessary for Aurora Calvert and Aurora Manokin to effectuate the transfer of the VA Contracts by signing the Novation Agreements so that Plaintiffs could, in fact, provide healthcare services to the VA-placed patients in the Calvert and Manokin Facilities.

30. As a result of Aurora Calvert's and Aurora Manokin's failure to sign the Novation Agreements, Plaintiffs lost at least $75,000 in reimbursements that they would have received had the Novation Agreements been timely executed by Aurora Calvert and Aurora Manokin.

**C.     Defendants mistakenly or fraudulently included all Operating Contracts into assignments executed as part of the Closing.**

31. Pursuant to § 1.1(a)(vi) of the OTA, the Transferred Assets also included all Operating Contracts that Plaintiffs "agree[d] to assume in accordance with Section 1.9."

32. Under § 1.9(a) of the OTA, Plaintiffs had the right, but not the duty, to assume any or all of Defendants' Operating Contracts by notifying Defendants, within 30 days after the OTA's execution, which Operating Contracts they wished to assume.  Specifically, § 1.9(a) of the OTA provides, in relevant part:

> Within thirty (30) days after execution of this Agreement, New Operators shall notify Transferors of any Operating Contracts which they desire to assume at the Closing […] Transferors shall terminate all Operating Contracts which are not Assumed Operating Contracts effective as of the Effective Time (to the extent that such Operating Contracts may be terminated as of the Effective Date in accordance with their terms), and remove the Facilities from all Global Contracts as of the Effective Time.

33. Pursuant to § 11.6 of the OTA, all notices contemplated in the OTA were required to be in writing and delivered by (a) hand-delivery or overnight delivery, and (b) by email, to the recipients identified in § 11.6.

34. At no time did Plaintiffs or its assignor, Axis Healthcare, send written notice of any kind to Defendants that any Plaintiff intended to assume any of the Operating Contracts. In fact, in an oral conversation between Plaintiffs' principal Abraham Kraus and Defendants' principal Stanley Snow that occurred shortly after the OTA's execution, Mr. Kraus expressly told Mr. Snow that Plaintiffs would not be assuming any Operating Contracts that were not terminable-at-will within 30 to 60 days' notice.

35. If Plaintiffs had agreed to assume any of the Operating Contracts, Plaintiffs would have, pursuant to § 1.9(a) of the OTA, provided notice to Defendants "[w]ithin thirty (30) days after execution of this Agreement" of their desire to do so. However, Plaintiffs *never* provided Defendants any written notification of their desire to assume any of the Operating Contracts pursuant to § 1.9(a) of the OTA.

36. Therefore, Plaintiffs manifested a clear intent to carry out the Closing and consummate the transactions contemplated in the OTA without assuming *any* of the Operating Contracts. Accordingly, under the plain language of the OTA, Defendants were required to terminate all Operating Contracts. In contravention of the OTA, Defendants failed to do so.

37. Pursuant to § 6.5 of the OTA, as a condition precedent to the Closing, Defendants were obligated to execute and deliver an Assignment and Assumption of Contracts ("**Assignment**"), substantially in the form set forth in Exhibit 6.5 to the OTA, to effectuate Defendants' assignment and Plaintiffs' assumption of (a) all Operating Contracts that Plaintiffs elected to assume pursuant to § 1.9(a) of the OTA ("**Assumed Operating Contracts**"), and (b) all of Defendants' Patient Agreements in accordance with § 1.9(c). Likewise, § 7.4 of the OTA obligated Plaintiffs, as a condition precedent to the Closing, to countersign the Assignment executed and delivered by Defendants in accordance with § 6.5.

38. In accordance with the form Assignment attached as Exhibit 6.5 to the OTA, the Assignment was to include a list, attached as Exhibit A to the Assignment, identifying each of the Assumed Operating Contracts.

39. Because Plaintiffs manifested an intent to conduct the Closing without assuming *any* of Defendants' Operating Contracts, the document attached as Exhibit A to the Assignment prepared, executed, and delivered by Defendants should have reflected that *none* of Defendants' Operating Contracts were being assigned to Plaintiffs, and that the only assets being assigned to Plaintiffs under the Assignment were the Patient Agreements.

40. On October 16, 2019, Defendants' transactional counsel delivered drafts of seven Assignments, one for each Facility, to Plaintiffs' transactional counsel for review and approval. That same day, Plaintiffs' transactional counsel responded with comments and requested revisions to the Assignments. These draft Assignments did not contain any list or schedules of Operating Contracts to be assumed as Assumed Operating Contracts.

41. On October 21, 2019, Defendants' transactional counsel delivered revised drafts of the seven Assignments to Plaintiffs' transactional counsel for review and approval. These revised drafts incorporated all of Plaintiffs' transactional counsel's previous comments and requested revisions from October 16, 2019 and were approved by Plaintiffs' transactional counsel as final versions to be executed by the Parties at the Closing. These approved draft Assignments did not contain any list or schedules of Operating Contracts to be assumed as Assumed Operating Contracts. True and correct copies of the approved draft Assignments are attached as Exhibit 3.

42. On October 25, 2019, in anticipation of the Closing, Defendants' transactional counsel delivered to Plaintiffs' transactional counsel PDF versions of all documents to be executed by the Parties at the Closing, including the seven Assignments. Each of the seven Assignments

were signed by Defendants and were delivered to Plaintiffs' transactional counsel for Plaintiffs' countersignature. However, contrary to the versions of each Assignment that Defendants' transactional counsel delivered to Plaintiffs' transactional counsel on October 16, 2019 and October 21, 2019, Defendants mistakenly or fraudulently attached to each Assignment, as Exhibit A to each Assignment, schedules of contracts erroneously identifying *all* of Defendants' Operating Contracts as Assumed Operating Contracts. True and correct copies of the seven Assignments delivered by Defendants' transaction counsel on October 25, 2019 are attached as Exhibit 4.

43. Plaintiffs' transactional counsel then forwarded only the signature pages of the seven Assignments to Mr. Kraus for his countersignature on behalf of Plaintiffs, without forwarding the attached schedules of contracts or advising Mr. Kraus that all of Defendants' Operating Contracts were being identified as Assumed Operating Contracts in the Assignments. Mr. Kraus then mistakenly countersigned the Assignments, completely unaware that the Assignments he had executed reflected that Plaintiffs were agreeing to assume all of Defendants' Operating Contracts – contrary to Plaintiffs' manifested intent, and the Parties' mutual assent, of the terms of the transaction to be consummated at the Closing. True and correct copies of the seven fully and mistakenly executed Assignments are attached as Exhibit 5 (the "**Executed Assignments**").

44. After the Closing, Plaintiffs discovered the mistaken/fraudulent inclusion of the schedules of contracts in the Executed Assignments and asked Defendants to terminate the Operating Contracts and advise the contract vendors that Defendants were no longer associated with the Facilities. Defendants rejected Plaintiffs' requests, demanded that Plaintiffs assume all of the Operating Contracts and all expenses and liabilities arising from them after the Closing, and

even represented to the contract vendors that Plaintiffs had taken over the Operating Contracts and should be invoiced directly for all contract charges.

45. As a result of Defendants' wrongful demands that Plaintiffs assume all the Operating Contracts and improper refusals to terminate the Operating Contracts and dissociate them from the Facilities, in material breach of § 1.9(a) of the OTA, Plaintiffs have incurred, and continue to incur, hundreds of thousands of dollars in damages. These damages include costs incurred for assuming Operating Contracts that Plaintiffs had no contractual duty to assume and paying Operating Contracts invoices that Plaintiffs had no obligation to pay due to vendor demands.

## FIRST CAUSE OF ACTION
**CONTRACTUAL INDEMNIFICATION**
**On Behalf of All Plaintiffs against All Defendants**

46. Plaintiffs re-allege and incorporate by reference each allegation averred in the preceding paragraphs.

47. Pursuant to § 9.4(b) of the OTA, the rights of indemnity provided in the OTA are the sole and exclusive remedy by which any party to the OTA can obtain relief from another party in breach of the OTA.

48. § 9.1 of the OTA contains the following indemnification provision, in relevant part:

<u>Indemnification by Transferors.</u> Subject to the other terms and conditions of this <u>Article IX</u>, Transferors shall indemnify and defend New Operators… and hold them harmless against and with respect to any and all Losses resulting from […] the failure of Transferors to comply with any covenant or obligation set forth herein…

49. § 1.9(a) of the OTA further provides, in relevant part:

Transferors shall indemnify and hold harmless New Operators for any Losses suffered by New Operators as a result of Transferors' failure to terminate as of the Effective Time the Operating Contracts which are not Assumed Operating Contracts.

50. The OTA at § 1.4(c) defines "Losses" to include "any damage, loss, liability, deficiency, cost and expense (including, without limitation, reasonable attorneys' fees)."

51. Accordingly, Plaintiffs, as assigns of Axis Healthcare, are entitled to recover from Defendants/Transferors all "Losses" incurred as a result of "the failure of Transferors to comply with any covenant or obligation set forth [in the OTA]" or as the result of "Transferors' failure to terminate as of the Effective Time the Operating Contracts which are not Assumed Operating Contracts."

52. As the preceding paragraphs allege, Aurora Calvert and Aurora Manokin have failed to comply with § 10.1 of the OTA by refusing to sign the Novation Agreements, which are necessary to effectuate the sale, assignment, and transfer of the VA Contracts from Aurora Calvert and Aurora Manokin to Axis Calvert and Axis Manokin.

53. Further, as the preceding paragraphs allege, Defendants have failed to comply with § 1.9(a) of the OTA by failing to terminate the Operating Contracts, which were not assumed by Plaintiffs, and remove the Facilities from the Operating Contracts.

54. As a direct and proximate result of Aurora Calvert's and Aurora Manokin's failure to sign the Novation Agreements, and Defendants' failure to terminate the Operating Contracts and remove them from the Facilities, Plaintiffs have suffered and continue to suffer substantial "Losses," as the term is defined in the OTA, in an amount to be determined at trial.

**WHEREFORE,** Plaintiffs respectfully request that this Honorable Court enter judgment in their favor against Defendants for compensatory damages in the amount of Plaintiffs' "Losses" in excess of $75,000.00, including reasonable attorney's fees and expenses, with costs, interest, and any further relief that this Honorable Court deems just and proper.

## SECOND CAUSE OF ACTION
### REFORMATION
**On Behalf of All Plaintiffs against All Defendants**

55. Plaintiffs re-allege and incorporate by reference each allegation averred in the preceding paragraphs.

56. As the preceding paragraphs allege, Plaintiffs manifested to Defendants an intent not to assume any of the Operating Contracts. Therefore, prior to the execution of the Assignments, Plaintiffs and Defendants had a mutual assent and meeting of the minds that Plaintiffs would not be assuming any of the Operating Contracts at the Closing.

57. As the preceding paragraphs allege, Defendants mistakenly or fraudulently attached as Exhibit A to the Executed Assignments schedules of contracts identifying all their Operating Contracts as Assumed Operating Contracts, and Plaintiffs mistakenly countersigned the Executed Assignments unaware that the Executed Assignments included schedules of contracts identifying all of Defendants' Operating Contracts as Assumed Operating Contracts.

58. Accordingly, the execution of the Executed Assignments was the result of either (a) a mutual mistake by both Plaintiffs and Defendants, entitling Plaintiffs to reform the Executed Assignments to reflect the intent of the Parties, or (b) a unilateral mistake by Plaintiffs induced by a fraud perpetuated by Defendants, entitling Plaintiffs to reform the Executed Assignments to reflect the true intent of the Parties.

59. Discovery is necessary to determine whether Defendants' inclusion of the schedule of contracts as Exhibit A to each Executed Assignment was the result of mistake or fraud.

**WHEREFORE,** Plaintiffs respectfully request that this Honorable Court enter judgment in their favor against Defendants reforming each of the Executed Assignments to state and reflect that none of the Operating Contracts shall be assumed by Plaintiffs, along with an award for

reasonable attorney's fees and expenses, costs, and any further relief that this Honorable Court deems just and proper.

**THIRD CAUSE OF ACTION**
DECLARATORY JUDGMENT
PURSUANT TO THE MARYLAND AND FEDERAL DECLARATORY JUDGMENT ACTS
MD. CODE ANN., CTS. & JUD. PROC. § 3-401 *ET SEQ.* AND 28 U.S.C. § 2201
**On Behalf of All Plaintiffs against All Defendants**

60. Plaintiffs re-allege and incorporate by reference each allegation averred in the preceding paragraphs.

61. As alleged in the preceding paragraphs, Plaintiffs contend that, in accordance with § 1.9(a) of the OTA, they manifested an intent to not assume any of the Operating Contracts, and Plaintiffs and Defendants had a mutual assent and meeting of the minds that Plaintiffs would not be assuming any of the Operating Contracts at the Closing. Therefore, the schedules of contracts identifying all Operating Contracts as Assumed Operating Contracts should have never been included in the Executed Assignments and are ineffective.

62. Defendants contend that the inclusion of the schedules of contracts in the Executed Assignments effectuates Plaintiffs' assumption of all the Operating Contracts.

63. Thus, an actual controversy of practicable issues exists between Plaintiffs and Defendants within the jurisdiction of this Court involving the rights and liabilities of the Parties under the OTA and the Executed Assignments, which may be determined by a judgment of this Honorable Court.

**WHEREFORE,** Plaintiffs respectfully request that this Honorable Court enter judgment in their favor declaring that Plaintiffs need not assume the Operating Contracts, along with an award for reasonable attorney's fees and expenses, costs, and any further relief that this Honorable Court deems just and proper.

Respectfully submitted,

Date:   July 31, 2020

*/s/      Nathan D. Adler*
Nathan D. Adler (Bar No. 22645)
Steven J. Willner (Bar No. 16341)
**NEUBERGER QUINN GIELEN RUBIN & GIBBER, P.A.**
One South Street, 27th Floor
Baltimore, Maryland 21202
Telephone:   (410) 332-8550
Facsimile:   (410) 332-8594
nda@nqgrg.com
sjw@nqgrg.com

*Attorneys for the Plaintiffs*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 31st day of July 2020, a copy of the foregoing **Amended Complaint** was electronically served via the Court's CM/ECF system upon:

Paul S. Caiola
David G. Sommer
Collin J. Wojciechowski
GALLAGHER EVELIUS & JONES, LLP
218 North Charles Street, Suite 400
Baltimore, Maryland 21201

*Attorneys for the Defendants*

*/s/      Nathan D. Adler*
Nathan D. Adler (Bar No. 22645)